**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| SHEILA HYSTER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 4:08-CV-1664 CAS |
| ) | |
| ETHEL HEDGEMAN LYLE ACADEMY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiffs Sheila Hyster, Jarvis Nunley and Barbara Simpson's motion for default judgment against defendant Ethel Hedgeman Lyle Academy ("defendant" or "the Academy"). Plaintiffs' motion is accompanied by affidavits and exhibits. The Court held an evidentiary hearing on plaintiffs' motion for default judgment on April 2, 2009. For the following reasons, the Court will grant plaintiffs' motion for default judgment and enter judgment in the amount of $50,000 for each plaintiff, for a total judgment against defendant of $150,000, together with costs and attorney's fees in an amount to be determined.

**Background**.

Plaintiffs Sheila Hyster, Jarvis Nunley and Barbara Simpson filed this action alleging that defendant allowed them to be subjected to a sexually hostile work environment and to be retaliated against, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Plaintiffs are current or former female employees of defendant who worked at its educational facility at 706 North Jefferson in St. Louis, Missouri, as security guards and office administrative

personnel. Plaintiffs alleged in the complaint that defendant allowed Dr. Mark Harrison, former Executive Director of the Academy, to subject each plaintiff to a sexually hostile work environment by, among other things, repeatedly requesting sexual favors, touching their breasts, placing his hands on their buttocks, touching plaintiff Simpson's vagina, and calling plaintiffs' cell phone to request sexual favors and make lewd sexual comments. Plaintiffs also alleged that Harrison retaliated against them for complaining about his sexual harassment by (1) threatening to place plaintiff Nunley on probation if she did not accede to his repeated demands for oral sex; (2) orchestrated the firing of plaintiff Simpson after she allegedly made a mistake related to employee paperwork; and (3) unilaterally changed plaintiff Hyster's work schedule so that she would be present on the weekend, where he attempted to sexually harass her.

Defendant was served with summons and complaint, but never entered an appearance and never responded to plaintiffs' complaint. On January 23, 2009, the Clerk of Court entered a default against defendant pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. See Doc. 9.

**Default Judgment Standard**.

Default judgments are not favored in the law, United States ex rel. Time Equip. Rental & Sales, Inc. v. Harre, 983 F.2d 128, 130 (8th Cir. 1993), and their entry is discretionary. See Taylor v. City of Ballwin, Mo., 859 F.2d 1330, 1332 (8th Cir. 1988). "The entry of a default judgment should be a 'rare judicial act.'" Comiskey v. JFTJ Corp., 989 F.2d 1007, 1009 (8th Cir. 1993) (quoted case omitted). There is a judicial preference for adjudication on the merits. Oberstar v. F.D.I.C., 987 F.2d 494, 504 (8th Cir. 1993). Entry of default judgment pursuant to Federal Rule of Civil Procedure 55 is appropriate only if there is a "clear record of delay or contumacious conduct." Taylor, 859 F.2d at 1332 (quoted case omitted).

Even when a defendant is technically in default and all of the requirements for a default judgment are satisfied, a plaintiff is not entitled to default judgment as a matter of right. 10 James Wm. Moore, et al., Moore's Federal Practice § 55.31[1] (3d ed. 2008); Taylor, 859 F.2d at 1332. Prior to the entry of a discretionary default judgment, this Court should satisfy itself that the moving party is entitled to judgment, including by reviewing the sufficiency of the complaint and the substantive merits of the plaintiff's claim. 10 Moore's Federal Practice § 55.31[2].

An entry of default from the Clerk of the Court pursuant to Fed. R. Civ. P. 55(a) is a prerequisite to the grant of a default judgment under Rule 55(b). Johnson v. Dayton Elec. Mfg. Co., 140 F.3d 781, 783 (8th Cir. 1998). "A default judgment by the court binds the party facing the default as having admitted all of the well pleaded allegations in the plaintiff's complaint." Angelo Iafrate Constr., LLC v. Potashnick Constr., Inc., 370 F.3d 715, 722 (8th Cir. 2004) (citing Taylor, 859 F.2d at 1333 n.7). Where default has been entered, the "allegations of the complaint, except as to the amount of damages are taken as true." Brown v. Kenron Aluminum & Glass Corp., 477 F.2d 526, 531 (8th Cir. 1973). If the damages claim is indefinite or uncertain, the amount of damages must be proved in a supplemental hearing or proceeding to a reasonable degree of certainty. Everyday Learning Corp. v. Larson, 242 F.3d 815, 818-19 (8th Cir. 2001).

**Discussion**.

    **A. Liability for Hostile Environment Sexual Harassment**

The allegations of plaintiffs' complaint establish the following facts:

Plaintiff Sheila Hyster, Jarvis Nunley and Barbara Simpson are female citizens of the State of Missouri and reside in the County of St. Louis. Plaintiffs timely filed charges with the U.S. Equal Employment Opportunity Commission alleging discrimination based on their sex, female.

3

Defendant Ethel Hedgeman Lyle Academy is a Missouri Corporation doing business in St. Louis, Missouri. During all relevant times herein, defendant has been a Missouri corporation doing business in the State of Missouri, and has continuously had at least 15 employees while engaging in an industry affecting commerce within the meaning of Title VII.

Plaintiffs are or were employees of defendant. During their employment with defendant, each plaintiff was sexually harassed by Dr. Mark Harrison ("Harrison"). Harrison acted as defendant's agent while serving as the Executive Director of defendant's educational facility located in St. Louis, Missouri. Harrison was the ultimate supervisor of each plaintiff.

During the course of plaintiffs' employment, Harrison repeatedly subjected each plaintiff to unwelcome sex-based comments and sex-based conduct. Harrison created a sexually hostile work environment by, among other things, repeatedly requesting sexual favors, touching plaintiffs' breasts, placing his hands on their buttocks, placing his hands on their legs, placing his hands on plaintiff Simpson's vagina, exposing his penis to the plaintiffs, and calling plaintiffs' cell phones to request sexual favors and make lewd sexual comments.

Plaintiffs utilized defendant's anti-harassment policy by complaining directly to Harrison as well as to other supervisors. Despite plaintiffs' complaints and repeated demands that Harrison refrain from making lewd sex-based comments and physically accosting them by touching intimate parts of their body, Harrison continued to engage in sexually harassing conduct toward the plaintiffs.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." See 42 U.S.C. § 2000e-2(a) (1). A sexually hostile work environment is a form of sex discrimination. See generally Harris v. Forklift

Sys., Inc., 510 U.S. 17, 21 (1993). To constitute a hostile work environment, the harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

To establish a prima facie hostile work environment claim for supervisor harassment, a plaintiff must prove: (1) she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment. Brenneman v. Famous Dave's of America, Inc., 507 F.3d 1139, 1143 (8th Cir. 2007). If a prima facie case of supervisor harassment is shown, the employer is vicariously liable unless it demonstrates that it is entitled to the Ellerth-Faragher affirmative defense. Brenneman, id. at 1144 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998)).

Plaintiffs' well-pleaded complaint easily satisfies the prima facie elements of a sexually hostile work environment. Plaintiffs are members of a protected group, female. The complaint demonstrates that Harrison's conduct was unwelcome because each plaintiff complained directly to him about the offending conduct. Plaintiffs' complaint clearly demonstrates conduct directed toward them "because of" their sex. Harrison's persistent requests for sexual favors, inappropriate sexual comments, exposing his penis to the plaintiffs, and grabbing plaintiffs' breasts and thighs as well as touching other intimate parts of their bodies, was both "severe" and "pervasive." This conduct altered the terms and conditions of plaintiffs' employment and thereby created a hostile and abusive environment.

5

Based on the well-pleaded allegations of plaintiffs' complaint, the Court finds plaintiffs have sufficiently alleged claims of sexual harassment pursuant to Title VII. Because of Harrison's supervisory position over the plaintiffs, the defendant is vicariously liable for his conduct. See Brenneman, 507 F.3d at 1144. Defendant has failed to answer or otherwise plead and therefore has not established its entitlement to an affirmative defense under Ellerth-Faragher. Therefore, the Court will grant plaintiffs' motion for default judgment.

**B. Damages**

Plaintiffs seek compensatory damages in the amount of $900,000, which represents $300,000 for each plaintiff based on statutory caps applicable to Title VII, 42 U.S.C. § 1981a(b)(3)(D). In support of the motion for default judgment, each plaintiff testified and submitted evidence establishing her damages, the necessity for medical treatment and the expenses she incurred. Further evidence was adduced proving the physical, emotional and psychological injuries each plaintiff has endured as a direct result of the actions of defendant's former Executive Director, Harrison. The Court will discuss the damages suffered by each plaintiff separately.

<u>Plaintiff Nunley</u>

Plaintiff Nunley testified and stated in her affidavit that she was hired by the Academy as a Safety Officer on June 12, 2005. Harrison was the Executive Director of the Academy at that time. Ms. Nunley testified that Harrison sexually harassed her by subjecting her to the following conduct:

1. On or about December 2, 2005, while plaintiff was riding on the elevator with Harrison, he told her that she made him have an erection and grabbed her hand and placed it on his erect penis. Plaintiff pulled her hand back and said, "You can't do that," and "Don't do that anymore," and

punched Harrison in the stomach. Harrison replied by saying, "Quit making excuses." Plaintiff then got off the elevator.

2. Also in December 2005, a few days after the elevator incident, Harrison began to come where plaintiff Nunley was while she on bus duty in the dock area, to ask she wanted to have sex with him. On one occasion, Harrison grabbed his crotch and said, "Do you ever think about having a quickie?" Plaintiff asked what he meant by that and Harrison replied, "Do you want to fuck?" Harrison then pulled his penis out of his pants. Plaintiff said "No, what is wrong with you? Stop it now!" Plaintiff ran from the area and immediately told her boss, Rodney Williams, what had taken place on the elevator on December 2, 2005 and on the dock.

3. In her job, plaintiff Nunley received calls for service that were dispatched over a radio. Ms. Nunley testified that Harrison was able to hear those calls and was always going on her calls when he heard them dispatched to her over the radio. On April 16, 2006, plaintiff Nunley was on the elevator again en route to a call for service at the nurse's office, when Harrison rubbed his penis against her buttocks. Plaintiff turned and told him that he was getting out of hand and that he needed to stop. Harrison responded, "Whatever, Ms. Nunley." They got off the elevator and went to the call, which came from the nurse's office.

4. Later the same day, Harrison called Ms. Nunley into his office. She saw that he had a letter in his hands. Harrison told Ms. Nunley that he was going to put her on probation for things that, to her made no sense and were untrue. Harrison told plaintiff that because she would not have sex with him and do the other things he wanted her to do, he was issuing her the probation letter. Ms. Nunley took the letter, balled it up and threw it at him and said, "I will not do nothing for you but my job."

5. On or about May 1, 2006, while plaintiff Nunley was in the cafeteria getting her lunch, Harrison walked up to her and said that her mouth was "big enough for his dick" to fit it. She said, "Would you please leave me alone. I am going to tell your wife on you." Harrison responded, "If you do, you will be out of a job."

6. On or about May 2, 2006, Harrison came to the dock area again and plaintiff Nunley immediately asked him what he doing back there. Harrison removed his penis from his pants, started rubbing it, and said, "See how you make me feel." Ms. Nunley walked away and told Harrison she was not doing bus duty anymore.

7. Harrison was the highest ranking official at the Academy during this time. In addition to reporting these events to her direct supervisor, Rodney Williams, plaintiff Nunley also reported the offenses directly to Harrison by making repeated requests for him to stop as described above. Harrison ignored her repeated requests to stop and continued to subject her to further harassment as listed above.

8. Plaintiff Nunley testified she needed her job at the Academy in order to support her children, and because Harrison was the highest authority at the Academy, she endured these repeated acts of harassment, even though she persistently voiced her objections to them.

9. On or about June 1, 2006, plaintiff Nunley and plaintiff Hyster talked and learned that Harrison was sexually harassing both of them. The two women telephoned Sam Howard, the Director of Imagine Schools, to get some help with the situation with Harrison. Mr. Precious Maybry, plaintiff Hyster's direct supervisor, was with them at the time and gave them Mr. Howard's number. Ms. Nunley testified that by that time, she did not care about her job anymore.

10. Mr. Howard told plaintiff Nunley that he had heard about Harrison's conduct, in general, and that Harrison had been fired and therefore Mr. Howard could not help her any longer.

11. Plaintiff Nunley noticed the next day that Harrison was no longer working at the Academy.

12. Plaintiff Nunley testified that Harrison's conduct and harassment has caused her severe grief, wide mood swings, low self-esteem, unnecessary irritation, stress, frustration, humiliation, and embarrassment. She testified that it was very difficult to care for her children during the time the harassment was ongoing, and that many of the symptoms she experienced then continue to occur intermittently to date.

13. The symptoms plaintiff Nunley experienced prompted her to seek medical care from Mr. Ajuma Muhammad, a licensed psychotherapist. Mr. Muhammad testified and also submitted a detailed written report concerning his treatment of plaintiff Nunley, filed under seal (Doc. 14), which the Court has read and considered. Among other things, Mr. Muhammad's report diagnosed Ms. Nunley with post-traumatic stress disorder and depressive disorder with recurrent episodes, and stated that she would need continued therapy.

14. Plaintiff Nunley incurred expenses for psychological treatment from Mr. Muhammad in the amount of $4,300.

### Plaintiff Hyster

Plaintiff Hyster testified and stated in her affidavit that she was hired by the Academy as a Safety Officer on August 22, 2005. Harrison was the Executive Director of the Academy at that time. Ms. Hyster testified that Harrison sexually harassed her by subjecting her to the following conduct:

1. On October 21, 2005, the day of plaintiff Hyster's father's funeral, she went to Harrison's office to pick up her paycheck with her fiancé and Harrison looked at her strangely and said, "Wow, you look gorgeous." Plaintiff made it clear to Harrison that his comment was unwelcome.

2. The following week, Harrison radioed plaintiff Hyster to come to his office, and then told her he had been watching her for a long time. Harrison quickly touched plaintiff's breast and leg and told her that he "really liked her." Plaintiff told Harrison that "it wasn't right."

3. In November 2005, plaintiff Hyster had gotten off of work and was sitting in her car on the back parking lot of the school when Harrison called her cell phone and told her to come back into the building. Plaintiff felt uncomfortable and refused.

4. In early December 2005, plaintiff Hyster was dressing for work when Harrison called her on her cell phone and demanded to come to her house, and told her that if she would allow him to, she could be late for work. Plaintiff responded, "Hell no, I have to go to work." Later that day, toward the end of her shift, plaintiff was doing her rounds on the third floor of the school building. Harrison joined plaintiff on her rounds and told her to go with him. They walked to the nurse's office and when they arrived, Harrison took his penis out of his pants and proceeding to touch plaintiff's breast and other body parts, telling her to have sex with him. Plaintiff immediately ran out of the nurse's office and grabbed her things and left the building.

5. In January 2006, on a day when school was not in session, Harrison called plaintiff Hyster's cell phone and asked her to meet him at the school and bring protection. Plaintiff told Harrison no, and to stop messing with her, that it was wrong. Harrison laughed in response.

6. In March 2006, Harrison radioed plaintiff Hyster to come to his office, and informed her that Mr. Maybry, the head of security, wanted to have her terminated, and that Harrison and Maybry

10

had a verbal altercation regarding her firing. Harrison told plaintiff that two other employees (one of whom was plaintiff Nunley) had written up negative statements on her, and she should not talk to them and should not trust them. Harrison told plaintiff that if she stuck with him she would be all right, and then he hit and grabbed her buttocks and said, "You know what I mean." Plaintiff quickly left the office.

7. Later in March 2006, plaintiff and her daughter, who attended the Academy, were sitting at the front desk because plaintiff had to open the school that day. Harrison approached plaintiff and said the school's back door was left unlocked and they needed to check throughout the building. Plaintiff told her daughter to come along, but Harrison told plaintiff's daughter to sit and watch the front desk. They proceeded to check the building, and when they got to the third floor there was an open door. Harrison told plaintiff to lock the door and when she went in the room to do so, he grabbed plaintiff around her waist, fondled her, and pulled out his penis, telling her to suck it. Plaintiff ran back downstairs to the front desk.

8. Harrison was the highest-ranking official at the Academy at this time. Plaintiff Hyster reported some of Harrison's conduct to her direct supervisor, Rodney Williams, as well as reporting it directly to Harrison and repeatedly asking him to stop. Harrison ignored her repeated requests to stop and continued to subject her to harassment as listed above.

9. Plaintiff Hyster testified that because she needed her job in order to support her child and because Harrison was the highest authority at the Academy, she endured the repeated acts of harassment, even though she persistently voiced her objections to them.

9. On or about June 1, 2006, plaintiff Hyster and plaintiff Nunley talked and learned that Harrison was sexually harassing both of them. The two women telephoned Sam Howard, the

11

Director of Imagine Schools, to get some help with the situation with Harrison. Mr. Precious Maybry was with them at the time and gave them Mr. Howard's number. Ms. Hyster testified that by that time, she did not care about her job anymore.

10. Ms. Hyster testified that Mr. Howard said he had heard about Harrison's conduct, in general, and that Harrison had been fired and therefore Mr. Howard could not help her any longer.

11. Ms. Hyster noticed the next day that Harrison was no longer working at the Academy.

12. Ms. Hyster testified that as a result of Harrison's conduct and harassment, she had suffered major trouble with relationships, severe grief, wide mood swings, unnecessary irritation, stress, frustration, humiliation, and embarrassment. She testified that it was very difficult to care for her child during this time, and that many of her symptoms continue to occur intermittently to date.

13. The symptoms plaintiff Hyster experienced prompted her to seek medical care from Mr. Ajuma Muhammad, a licensed psychotherapist. Mr. Muhammad testified and also submitted a written report concerning his treatment of plaintiff Hyster, filed under seal (Doc. 15), which the Court has read and considered. Among other things, Mr. Muhammad's report diagnosed Ms. Hyster with major depressive disorder with recurrent episodes, and stated that she needs to undergo extensive therapy.

14. Plaintiff Hyster incurred expenses for psychological treatment from Mr. Muhammad in the amount of $500.

<u>Plaintiff Simpson</u>

Plaintiff Simpson testified and stated in her affidavit that she was hired by the Academy as an Assistant Business Manager on August 8, 2005. Harrison was the Executive Director of the Academy at that time. Ms. Simpson testified that Harrison sexually harassed her by subjecting her to the following conduct:

1. Starting on or about August 10, 2005, Harrison began making comments to Ms. Simpson such as, "Boy you look really good to me," and "I like women with small breasts."

2. On or about October 21, 2005, when plaintiff Simpson was returning from Sheila Hyster's father's funeral in a car with Harrison, he pulled the car over to the side of the road and put his hand on her leg. Plaintiff pushed Harrison's hand off of her leg and told him, "Don't put your hands on me." Harrison responded, "I have power."

3. The next week, Harrison began making unexpected visits to the office when plaintiff Simpson arrived to work and would tell her that her legs made him "so horny" that he would "mess up his underwear." Plaintiff Simpson testified she would just turn her head because it made her sick to her stomach, and that Harrison said if she told anyone it would cost her job, and she believed him. Plaintiff testified that Harrison would touch her on her legs, buttocks, or breasts whenever he could get close to her.

4. In approximately November 2005, Harrison calling plaintiff Simpson to come into his office, and he would start talking about sex and how he wanted her to "suck his dick." Harrison would have plaintiff Simpson walk the building with him saying that they needed to look at different parts of the building because it was under construction, which Simpson believes was a ploy to touch her as he pointed out things. Each time he saw plaintiff Simpson he told her that she "made him horny." Plaintiff would tell Harrison to stop but he would respond that he had "power."

4. In approximately December 2005, plaintiff started teaching pompons after school and Harrison would call her away from the young ladies she was teaching and try to have sex with her in the nurse's office. Harrison would pull on the jogging pants plaintiff wore to teach pompons and she would push him away. After that, she took a student with her when Harrison called her away.

13

5. In approximately January 2006, Harrison would call plaintiff Simpson on the phone at her desk and say things to her such as that he was "horny" and his "dick is ready to get wet." Plaintiff would hang up the phone and walk away, and then Harrison would call her on her cell phone. Plaintiff told the sexual harassment contact person and the curriculum coordinator, both of whom worked under Harrison's supervision, that Harrison would not stop calling her, even though she tried to get him to stop. Plaintiff Simpson then heard a rumor Harrison was "touching on" Sheila Hyster and was relieved because she thought he would not bother her anymore.

6. On or about February 24, 2006, plaintiff was late leaving for work and Harrison showed up at her door and told her that if she didn't open the door he would fire her. She opened the door and Harrison came in and made her have sex with him. Afterward, plaintiff felt dirty and sick, and depressed to the extent she did not feel she wanted to live anymore. Plaintiff's doctor prescribed Lexapro, an anti-depressant.[1]

7. Started in early March 2006, plaintiff began sleeping with the lights on at night because she was afraid that Harrison was coming back to get her. Harrison came into the business office where she worked and continued to touch her legs and buttocks when he could get close to her. Plaintiff tried to keep a student in the office until another coworker came in, and then she would send the student to class. Plaintiff noticed that her hair was starting to fall out, and Harrison kept asking her for sex and calling her cell phone.

8. In April 2006, plaintiff's hair continued to fall out and Harrison kept telling her she had to sleep with him again. Plaintiff could not focus on work because Harrison would not stop calling her.

---

[1] See Physicians' Desk Reference 1175-76 (Thomson Healthcare, 62nd ed. 2008).

9. Plaintiff testified that because she needed her job and because Harrison was the highest authority at the Academy, she endured his repeated acts of harassment, even though she persistently voiced her objections to them. Plaintiff did not know any higher authority to whom she could report Harrison's actions. Plaintiff testified that when she felt she could no longer endure any more and did not care whether she lived or died, she explained her feelings to Harrison in an effort to get him to stop and leave her alone, but Harrison was not deterred and continued to make unwelcome comments and physical advances.

10. In May 2006, plaintiff changed her cell phone number because of Harrison's repeated calls. When Harrison asked her about it, she told him she no longer had a cell phone because she could not afford it. Harrison was angry and told her she shouldn't have done that, and started calling her home number to see if she was at home. Plaintiff told her children not to answer the phone if a certain number appeared on the caller ID. Harrison told plaintiff he knew she was lying about the cell phone because she had children she needed to talk to.

10. In June 2006, Harrison caused plaintiff to be fired from the Academy, allegedly for making a common clerical error with respect to a coworker's health benefits paperwork.

11. Plaintiff Simpson testified that as a result of Harrison's actions, she has suffered sleepless nights, hair loss, uncontrollable crying, profuse sweating, rash, irritable bowels and nightmares, and has felt dirty, shamed, humiliated and embarrassed. Plaintiff testified that all of these symptoms continue to occur intermittently to date.

12. The symptoms plaintiff Simpson experienced prompted her to seek medical care from Mr. Ajuma Muhammad, a licensed psychotherapist. Mr. Muhammad testified and also submitted a written report concerning his treatment of plaintiff Simpson, filed under seal (Doc. 13), which the

15

Court has read and considered. Among other things, Mr. Muhammad's report diagnosed Ms. Simpson with post-traumatic stress disorder, and adjustment reaction with anxiety and depression, recommended that she continue therapy, and stated that he expects Ms. Simpson to continue to suffer these symptoms for an indefinite period of time.

13. Plaintiff Simpson incurred expenses for psychological treatment from Mr. Muhammad in the amount of $1,650.

14. Plaintiff Simpson testified that the defendant had approximately eighty employees for more than twenty weeks per year at all relevant times.

### i. Compensatory Damages

Under Title VII, a plaintiff may recover compensatory damages for medical expenses as well as for pain and suffering. "An award of damages for emotional distress must be supported by competent evidence of 'genuine injury.'" Forshee v. Waterloo Industries, 178 F.3d 527, 531 (8th Cir. 1999) (citing Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978)). A "plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997).

The evidence supporting each plaintiff's claim for emotional distress damages is very strong. The Court had the opportunity to observe the plaintiffs' demeanor as they testified, and observed that each plaintiff exhibited emotional distress while testifying about Harrison's actions. Each plaintiff testified she suffered severe and long-lasting mental distress and disruption of her life as a result of Harrison's abhorrent conduct, such that psychological counseling was necessary. The sexual harassment of each plaintiff by Harrison was severe in nature, including physical contact and threats of retaliation, and occurred on multiple occasions. Mr. Muhammad, the psychotherapist,

corroborated the plaintiffs' testimony concerning their mental distress and opined that each plaintiff had a diagnosable psychological condition as a result of Harrison's conduct. Plaintiff Simpson also suffered physical effects from the harassment and needed to take anti-depressant medication. There was evidence that each plaintiff incurred medical expenses for psychological counseling.

Based on all of the evidence presented, the Court will award each plaintiff compensatory damages of $50,000 for emotional pain, suffering, mental anguish, loss of enjoyment of life, and medical expenses. This is the statutory damage cap applicable to a defendant employer with less than 100 employees. See 42 U.S.C. § 1981a(b)(3)(A). The Court finds that each plaintiff's compensatory damages would actually exceed $50,000, and the Court would award an amount of compensatory damages in excess of $50,000 to each plaintiff, but for the statutory damage cap. Because the amount of compensatory damages awarded equals the statutory damage cap, the Court does not award punitive damages.

  ii. Attorney's Fees.

Plaintiffs also seek their attorney's fees as prevailing parties. Under 42 U.S.C. §§ 1988 and 2000e-5(k), prevailing parties in Title VII actions are entitled, at the district court's discretion, to attorney's fees as a part of the costs. St. Louis Fire Fighters Ass'n Int'l Ass'n of Fire Fighters Local 73 v. City of St. Louis, Mo., 96 F.3d 323, 330 (8th Cir. 1996). "[A] prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 417 (1978).

The starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Fish v. St. Cloud State Univ., 295 F.3d 849, 851 (8th Cir. 2002) (citing

17

Hensley). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. As a general proposition, a reasonable hourly rate is one that corresponds to the prevailing market rates in the relevant community. Blum v. Stenson, 465 U.S. 886, 895 (1984); Fish, 295 F.3d at 851. The district court is required to exclude from the initial fee calculation hours that were not "reasonably expended," i.e., that are excessive, redundant or otherwise unnecessary. Hensley, 461 U.S. at 434.

There is no evidence in the record establishing the number of hours expended on the case and the hourly rate charged. The Court will order plaintiffs to provide this information so that a fee award can be made.

**Conclusion**.

For the foregoing reasons, the Court will grant plaintiffs' motion for default judgment against defendant Ethel Hedgeman Lyle Academy in the total amount of $150,000, consisting of a judgment for each plaintiff of $50,000. Plaintiffs will be ordered to submit documentation to support their attorney's fee claim.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for default judgment is **GRANTED**. [Doc. 10]

**IT IS FURTHER ORDERED** that by **May 6, 2009**, plaintiffs shall submit documentation to support their claim for attorney's fees, preferably in the form of an affidavit, which shall be sufficient to establish the number of hours reasonably expended on this case and the applicable hourly rates.

An appropriate judgment will accompany this memorandum and order.

_____
**CHARLES A. SHAW
UNITED STATES DISTRICT JUDGE**

Dated this  15th  day of April, 2009.